Thank you very much, Your Honor. On behalf of the petitioner, Gaurish Sareen, to please the Court, the question posed in this petition is the role the immigration judge played, which was affirmed by the Board of Immigration Appeals, on the decision that was based on his personal assumptions, speculation, and conjecture. And we're asking a review from this panel to please vacate, which compels, I believe, to vacate his decision as it's based not on any viable facts or testimony or documentation. His initial, that is, the immigration judge's initial finding was that my client's application of asylum on page 8 was the same signature, I mean, letter of 4-29-98 to match the death certificate of his brother Ram Singh. And a review, just a review of anybody, of an average individual, including me, indicates that they're not similar, and, in fact, the date read by the immigration judge is wrong. It's 4-24, which is on the second page prepared by the preparer. The immigration judge used that as his principal motive of attacking the veracity and viability of my client's claim. The second part, which the government even concedes on page 13 of their brief, is he misread the photographs, which were when his brother testified, Rajinder, they basically all have similar names, had photographs of my client's injuries. And the judge accused my client of trying to fool the court by submitting injuries of Rajinder while it was the other way around. Based on these reasons, which were quoted by the judge. On page 197 of the transcript, Rajinder says that the photograph is a piece of 240 is his foot, Rajinder being the brother. Do you have a record there? Yes, sir. Do you want to look at it or do you want me to take my word for it? It says this is of my foot. Would you look at these photographs? Do you recognize that photograph? This is from line eight. Do you recognize that photograph? Yes. And what is it of? This is of my foot. Okay.  It was also in your client's file. So Rajinder says this is Rajinder's foot. And that photograph makes its way in your client's file. Yes, sir. Okay. So it's not the case, as you suggested in your brief, that there were somehow photographs of your client somehow got into Rajinder's file. This is a photograph that Rajinder himself identified as being his foot that made its way into your client's file. So if the question arises, what is a photograph of his brother's injury doing in your client's file? Why couldn't I.J. say that it's fraud? Jan, I'm not disagreeing with you, but I can read from the Respondent's brief. They're agreeing with me on page 13. It states that Rajinder testified on page 13. You said that some of Rajinder testified that some of the photographs in his application were photographs of his brother. So that's not inconsistent. They can both be true, that in Rajinder's case, there were some photographs of Raj, and in Raj's case, there were some photographs of Rajinder. That's correct. Or a photograph. But that was the basis for the judge to find or make a finding of fraud or allegations of fraud. As you have clearly indicated, it's not inconsistent. There were some photographs. No, no. I said it's not inconsistent that in both cases they used the same pictures of some of which were of Rajinder, some of which were of Raj. That is true. It's still true that there is a picture in your client's file of a foot that is not his. That is correct. And it needs an explanation. What's the explanation? The explanation that was provided at the hearing was that the preparer mixed up the photographs, and that's what Rajinder also said. It was prepared, excuse me, by a similar individual or a notary, and the photographs You say explanation was. Who gave this explanation? Rajinder. Rajinder was asked about how the photographs got into his file. I don't remember anybody being asked how the false photograph got into your client's file or giving an explanation of that. Well, I'm guessing Rajinder, when he was asked that by the trial attorney for the government, stated specifically that the preparer mistakenly put the photographs there. Yes, I have mistakenly put the photographs of your client into his, Rajinder's, file. That's correct. The question is, where is there an explanation as to how the fraudulent photographs got or the false photographs got into your client's file? He wasn't asked that. He was asked that. He said, you know why your photographs are in your brother's file? This is to Rajinder. And he says, I give this to a person named Mohammed, and maybe it was a mistake. That's right. That's what he was asked. He was asked why is his photo in his brother's file. That's, of Rajinder, that's correct. My client's Raj, and my understanding was he tried to show the judge his injuries and show his marks on his fingers, which were crushed, and the marks on the judge said he's not a medical doctor and he didn't want to see him. I said, where is this in the record? My recollection was that the record said how did the photographs of the brother get into your file, not how did the photographs of you get into your brother's file. Do you have it where it is in the record? Yes, sir. How would Rajinder know anyway as to how things got into your client's file, into his brother's file? I can't tell you how. How can Rajinder clarify the status of your client's file? Your client didn't testify as to this. That's correct. But Rajinder was asked that by the trial attorney, and that's the explanation he gave. But Rajinder doesn't have a control over your client's file. He doesn't know why things were put in the file. He just can say I gave the photographs to somebody. He can't say, oh, you know, it's because my brother told him to put the files in the file or what. I mean, he has no, Rajinder has no control over what goes into his brother's file, into your client's file. That is completely correct. Your brother or his lawyer might be able to speak to that or whoever was representing him or whoever prepared the file, but there's no explanation like that. There's no one like that who speaks to that issue. The only reasonable explanation was that it was the same preparer and the photographs. Or that they were fraudulent or that they were trying to perpetrate a fraud, which is what the I.J. inferred. Well, we believe that. Do we know that it's the same preparer? They both stated. Do we know that it's the same preparer? Based on what Rajinder said. Raj, my client, never said that. Rajinder said that. And that's it. How does Rajinder know who prepared his brother's application? I mean, wasn't there a story that they haven't talked, they separated at birth, so they separated when they landed in this country and one of them was tracking all of the country and the other one was in Los Angeles and couldn't even be sure that who showed up at the hearing because he didn't have any way of getting in touch with him? Wasn't there a whole story that they hadn't seen each other, had no contact, and all of a sudden he comes into court and turns out the files all contain the same photographs? If I may respond, Your Honor, basically the facts were when they first came into this country, they prepared their application, was mailed by the preparer. One brother, that's Rajinder, became a truck driver. My client stayed in Southern California. Both their applications went through the system. When my brother was referred to court, he wanted his brother to testify and verify the claims, basically because they had similar facts of their arrest and that their brother had been murdered. Very similar. They had the same photographs. They even claimed the same photographs. They had one similar photograph and Rajinder had one. No, no. There were more than one photograph. There was one photograph that has been identified as being Rajinder's foot in your client's file, but there were clearly other photographs in your client's file that were also in Rajinder's file. That is correct. It was not just one common photograph. There were at least three or four common photographs. But in my client's file, there was one photograph of Rajinder's foot. Most of the injuries were to my client's fingers and his legs, which were shown and proven to be caused by the Indian security forces. Where is the explanation that you say? So the only one that explains the whole situation is Rajinder, right? And do you remember where it is in the transcript? Insofar as where he states that. It gives an explanation about how these photographs got in there. Maybe you can save it for rebuttal and you can come up with a citation. I believe it's on page transcript 000176. 176. I'm just reading. What line? 21 to 23, Your Honor. But maybe I'll save it for rebuttal. Okay. Justice, Mr. Johnson. Why don't you look that up? According to the government's brief, it's 197 to 198. I don't have much time. If I could just keep it for rebuttal, Your Honor. Thank you. Maybe it was a mistake. I did not do it myself. May it please the Court. Jamie Dowd on behalf of the Respondent Attorney General. It is at page 197 where Rajinder identifies the photo of the foot as his own. And as the Court has pointed out, however, four of the five photos were common photos and were not identified as belonging to either brother specifically. They were just identified as common photos, so we don't know exactly who they were photos of. We know specifically the foot was a photo of Rajinder's foot and not of Mr. Kumar's foot. And it showed up in both files? Yes, sir. Four of the five photos showed up in both files. Including the foot? Yes, Your Honor. Okay. And were there any face shots? Not that I'm aware of. So it's not like you could look at the photographs and tell who? That's correct, Your Honor. They were unidentified as belonging to any specific person. They were body parts. They were not face shots. That's correct, Your Honor. And Mr. Kumar never informed the judge that at least one of the photos was of his brother. As the Court has pointed out, it was actually Rajinder who testified that the photo was his foot. Mr. Kumar never testified that that photo did not belong to him. Did anybody ask him? I'm sorry, Your Honor? Did anyone ask him? I don't recall specifically if he was asked if the photo was of his own foot. His brother testified after him. So he had testified. Nobody said to him, you've got five pictures in here. One is your brother's. Can you tell us how your brother's picture got in here, why it's your brother's picture? I don't recall that testimony specifically. Was he represented by counsel? I'm sorry? Was he represented by counsel? Yes, he was. And was the government also represented by counsel? Yes, Your Honor. And was the government concerned about this possible misrepresentation? Well, the government was concerned. That's why. Did they ask him about it for an explanation? Well, they asked Rajinder who testified after him. Oh, did they ask him, Raj? They were concerned that Raj was making a misrepresentation because he had a picture, one picture out of five, in his folder that was identified as his brother. Did they say to him, how come you have a picture of your brother in here, and give him a chance to answer? Well, at the time that Mr. Kumar brought up. Did he answer to that question yes or no? Well, not at the time that he testified. There was no indication that this was his brother's photograph at the time Mr. Kumar brought it up. So the answer is the government did not ask him to explain this discrepancy in the application. He testified before Rajinder? He testified before. At the same session? And then he went home. He was not available again? He was in the courtroom during his brother's testimony. But there was no indication during Mr. Kumar's testimony. Did his lawyer recall him to explain this discrepancy? No, Your Honor. Not to my knowledge. Did his lawyer ask him any questions about it when he first testified? He was just asked if these photos, as a part of authenticating the application, if these photos, if he knew all the information was correct and signed off on it as all being authentic and his own information. And he identified the photos as photos of his own injuries. Never testified that, notwithstanding. And then his brother testified that that was, in fact, the one photo was, in fact, of the brother's. What page did he say, can you tell us in the record, did he say that each picture was his? That was he shown each picture and asked to identify each one? No, Your Honor. But he was asked if the information. Oh, the information in the affidavit was true. Right. If the information contained in the application was correct, yes. But he was not shown each picture and said, is this a picture of you? That's not to my knowledge, no. But the immigration judge, from the testimony that was given, made the finding that Mr. Kumar, because he included these photos as his own, in his own application, that he had tried to pass off at least one photo of his brother as his own. This is the same judge who's an expert on reading numbers and knows that there's fraud because he thinks the two fours are the same. Well, and I understand the Court's concern with that. However, that's not the only basis for the adverse credibility finding. The judge did compare the numbers and did find that they looked similar enough. The odd thing is that the other numbers don't look very similar at all, the other numbers on the same documents, like the two, don't look at all similar. This judge seemed quite anxious to draw an inference of fraud from looking at documents that are in no way similar and saying that I can tell that one number in both documents must have been written by the same person, and therefore, this must be a – this whole application must be fragile. Well, the immigration judge's finding, adverse credibility finding, was based on several things, not just the – Do we disregard that one about his expertise in reading numbers? Well, I'm not sure that the immigration judge would deem himself an expert at reading numbers. However, an expert's not necessary. So we can read them as well as he can? Yes, Your Honor. I mean, it's – the Court doesn't – this circuit does not require expert testimony in terms of comparing the two numbers. The immigration judge just looked at it. There was no expert. And he could tell it was a fraud by looking at those two numbers, that the two 4s were similar. That was just one basis of his finding of fraud. With regard to the documents, it was the only basis, right? Well, with regard to that specific – the death certificate, with regard to that specific document, that was his basis for finding that that document was fraudulent. Was that effort brought up – was that brought up at the hearing at all? That being – The poor question, yes. Did he point to that at – during the hearing? I am not – let me just look and see. I'm not sure, Your Honor. I don't recall that being in the transcript. I just recall it being in his actual decision, the written decision, but I don't –  Well, there were several stops in the proceeding. I know, right. I see. So sometimes they issue the oral decision right away, and sometimes they tell him to come back for the decision. That's correct. And I believe what happened here was the proceedings were put on hold so that Mr. Kumar could come back and testify with regard to his eligibility for voluntary departure, and I believe that the decision was issued at that time. So it wasn't directly following the testimony, but it was at another point in time. The immigration judge's adverse credibility finding was also based on implausibilities in Mr. Kumar's testimony, including the fact, as the court pointed out, that he initially testified he did not know where his brother was located, despite the fact that they arrived in the United States together, and then was able to produce his brother at a later point in the proceedings to testify on his behalf. They did him a continuance so he could get his brother, who he said was a long-distance driver, and he didn't know where he was at the time, and that he drove all over the country. So they gave him two months to produce his brother, and he did, right? He did. Yes. Eventually, Your Honor, he did. Well, not eventually. They gave him two months to find him and to continue the hearing so he could have his brother there, and he had him there. That's correct. He did. Additionally, the immigration judge found that it was implausible that the local police department had actually stopped Mr. Kumar in the street and asked him to aid their investigation in finding an alleged local terrorist, and that they would then take that terrorist statement with regard to whether or not Mr. Kumar was involved in some sort of terrorist activity. What's so strange about if he goes to the terrorist's door, turns him into the police, as it appeared to the terrorist, then they question the terrorist later who's been So he names the guy who turned him in. What's so strange about that? Well, there are several things, the first being that the police station, Mr. Kumar's home, and the terrorist's alleged home were within two to three miles of one another. That has nothing to do with the question I asked, but why is it strange for the terrorist to name him if the terrorist wanted to get even? Well, there's no indication that these two men knew each other at all. The terrorist's indication is that he did know each other. He testified that he knew this guy. He testified that he knew where this man lived because he had He testified that he knew him from his store and they were in some club together. He testified that he knew him. I do recall that he testified he knew him from the fact that he shopped in his store. And also there was some club or something. I don't recall the club. So they did know. So there was testimony that they knew each other. Well, tangentially he knew him just as being a They did know each other. Your statement they didn't know each other, there's no evidence, is not correct. The evidence is that they did know each other. I misspoke. I'm sorry. That they personally were, you know, had some sort of relationship. But they did know. He did know who this person was in terms of being able, I guess, to point to where this man lived. What's the implausibility there? Well, the immigration judge found it implausible that the police would use a random citizen. That's a different point. There are two separate points. One implausibility is that they would use a citizen to go front for them and knock at the door and try to get in. That was the first implausibility, which I also don't find implausible. The second implausibility was that the terrorist would name the man who turned him in. And say, this is a terrorist, go after him. That's the second one, the one that we were talking about. That's correct. Which I also don't find implausible. You know, that's not what the I.J. said. What he found implausible is that the police would accept this deathbed confession and persecute Petitioner because of this deathbed confession. That's what the I.J. found implausible. Not the fact that the terrorist would finger the guy who he believed had snitched on him. That's correct. Actually, his words were an alleged deathbed statement from this known terrorist. That the police would act on that and would then persecute Petitioner. The police would check it out and arrest him, like the fellow who just got released in Iraq. It's plausible that you would think that the movie maker was a terrorist and that you would arrest him and that you would hold him for 50 days. Very implausible. Those things seem to happen, don't they? Well, I don't think, Your Honor, that the immigration judge found it implausible that they would arrest someone that they may have thought was a terrorist. I think the implausibility being that they would take the statement from an alleged terrorist, then arrest Mr. Kumar and persecute him just based on simply the statement and no other background. He never testified that he was involved in any sort of activity or that, you know, that there was any reason to link him to either this man or any terrorist activity in general. The country reports in this situation suggest that there were a lot of rather similar things happening at the time. Is that not true? Well, the immigration judge did note that the country reports stated that there were – that these types of tactics had been used in terms of interrogation and things like that, but that that alone, just because – Sorry. The investigative system was miserable and so on. It's rather strong statements and unusually so. Right. But that alone is no indication that Mr. Kumar specifically was either arrested or persecuted on account of any particular – No, that's true. But it makes more plausible things that may not be plausible in an orderly society. That may be correct, Your Honor. But the immigration judge's specific finding was that notwithstanding the tactics that are used by the police in this particular area, there's no indication that Mr. Kumar was persecuted on account of any protected grounds, notwithstanding the fact that he may have been arrested or questioned in a way that may not have been particularly savory, but that there was no indication it was on account of a protected ground, which – Several thousand people were held in short-term confinement in transit interrogation centers in a relevant time period. Yes. And the immigration judge does note that the State Department reports have that type of language in them. I see my time is up. Thank you. Do you want to try that again? No, I have some questions. I just want to bring the court's attention – Well, come up. Come forward if you want. The country report on page 00246 goes into much more detail about the deficient police methods and training and the significant – What about the question of internal relocation? Excuse me, Your Honor. The country report says there are problems with police in those two provinces, but it doesn't say that the same problems exist elsewhere in India. Why couldn't your client have internally relocated in India? Well, that goes with the precedent court decisions from the circuit. Let's say once the government agents have singled you out and named you as an individual who they suspect of terrorist activities without providing you any judicial recourse, you don't need to show countrywide persecution, Your Honor. Well, it's not quite that. It says the burden is on the government, then, to show that you can relocate. That's correct. And why hasn't the government carried this burden? They have a country report that says there are problems in a couple of the provinces, that they are named. There are not similar problems in other parts of India. They never have addressed that. It never ever came to that. They never ever addressed that. Well, the IJA did make a finding, I thought, about internal relocation. Am I mistaken about that? Well, the IJA found out, Your Honor, was basically my client wasn't credible. And even if he was found credible, he didn't believe what the police did to him rose to past persecution. So if we were to agree with you, what would we do? Would we remand the case for issues regarding relocation and other wealth and affair questions? Well, that's one issue. The other issue is really the issue on the authenticity of the death certificate, which allegedly has caused no, no. I'm asking you what the relief do you expect us to give? Well, I believe the way my client was treated, he's demonstrated past persecution as well as a wealth and affair future persecution. The question is, are there any issues that we need to remand other than for the discretionary grant of relief? To address the issue that Judge Kuczynski raised. It's wealth and affair questions in general, because you have a presumption If you prevailed, you would have a presumption of past persecution of wealth and affair, but it's rebuttable by the government. That's correct. So do we remand at that point or not? I leave that up to you, but I would believe that basically the... You're going to have to leave everything up to us, but it sometimes helps if you know the law and answer the questions. Now, there are two ways that you prove asylum cases. One is through past persecution, which is Judge Berzon just explained, leads to a presumption. Then you have a presumption which the government can rebut. Those issues either were all resolved by the immigration judge originally, or some need to be remanded if he did not address and resolve them. The other way you win an asylum case is to show not past persecution, but that you have a direct well-founded fear of future persecution, not relying on a presumption, but because you establish a well-founded fear based on what happened. That is correct. If you do that and the immigration judge has ruled that you have no well-founded fear, and he's reached that ultimate issue, then you don't need to remand. And Judge Berzon has asked you what state this case is in. I believe the judge made a mistake in not finding past persecution, and he showed past persecution, and he showed also that he had at least a 10 percent chance of being persecuted if he returned back to India. So to answer your question specifically, I believe he showed both past persecution and a well-founded fear. Thank you. And did the IJ rule on all of those issues, or are there some that need a remand? The IJ ruled and felt that my client, as Judge Kuczynski stated, could relocate in India, and he could have gone to another place in India far away from this area. What's your answer to that? My answer to that was that the government had selected him for persecution and labeled him a sympathizer or affiliation with Islamic terrorists, and he wouldn't be able to live in safety anywhere in India. He had at least a 10 percent chance of being persecuted again. Thank you. Before you go, you have the record there? Look at the exchange on page 147 of the record, page 76 of the transcript. This is a passage that's quoted on page 10 of the government's brief, where there is a discrepancy between the dates, February 25th and February 5th. Do you have the record there? You can find the same exchange in the government's brief on page 10. Are you talking about the transcript, page 147 here? Yes, it's dates number 147. There's a little number at the bottom. It's page 76 of the typed page. It's page 147 of the record. There's a discrepancy here with the dates. Your client gets asked how he reconciled these two dates, and they seem to be ‑‑ He said he was confused, Your Honor, with the events as to the dates of the questions being asked. That's my question. When he is found to have had a discrepancy in the dates like that, and his answer is, I was confused, my brain did not work well. Is that something that explanation that the I.J. must accept? No, Your Honor. Basically, what the I.J. should accept is the trauma he's gone through. He's testifying through an interpreter. No, but he's not saying I misunderstood the date or, you know, there was mistranslation or anything else. He essentially admits that he gave the wrong date, and he says, my brain did not work well. Is the I.J. required to accept that explanation? Can the I.J. say that that's what people who lie say? The I.J. can reach his conclusions as he is the best person in the given situation to view what is being transferred. So he could look at this exchange and decide that that is not a satisfactory explanation for it. Did the I.J. look at that exchange and, in his report, rely on that? Why doesn't he answer my question first? Then he can ask yours. He can't do that, right? Could he do it? I'm sorry. I'm getting two questions. Yes. I can't wait for your answer. The first question is, the first question is, could he? The second question is, did he? My question is, I don't know. No, not your question. We have two questions already. Judge Kaczynski's question is, could he rely on that and reach a conclusion? That's the first question. The answer is yes. Second question, did he rely on that and reach a conclusion? I don't believe so. Thank you. Thank you. I had a more direct answer to that. Thank you. The case just argued will be submitted, at least for the time being. The next case, next two cases, Pozos v. Gonzalez and U.S. v. Ocampo are submitted without argument. The next case for oral argument is Parker v. Filer. The litigious Mr. Filer, huh? The litigious Mr. Filer. Yes. Yes. I hate you.
judges: Reinhardt, Kozinski, Berzon